1  Arlo Garcia Uriarte, SBN 231764
   Un Kei Wu, SBN 270058
2  Ernesto Sanchez, SBN 278006
   Daniel P. Iannitelli, SBN 203388
3  LIBERATION LAW GROUP, P.C.
   2760 Mission Street
4  San Francisco, CA 94110
   Telephone: (415) 695-1000
5  Facsimile: (415) 695-1006
6
7  Attorneys for Plaintiffs
   **Edgardo Dones**
8  **Romeo Vite**
   **Emmanuel Berjamin**
9
10             UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12                   OAKLAND DIVISION

13

14

15  Edgardo Dones, Romeo Vite, Emmanuel      Case No.  4:18-cv-01503-YGR
    Berjamin, on behalf of themselves, others
16  similarly situated, and general public,    CLASS ACTION

17                                             **NOTICE OF MOTION AND MOTION
                   Plaintiffs,                 FOR FINAL APPROVAL OF CLASS
18                                             ACTION SETTLEMENT**

19         v.                                  Hearing Date: September 10, 2019,
                                               Time: 2:00 PM
20                                             Courtroom: 1
    Primeflight Aviation Services, Inc., and
21  DOES 1-25,                                 Action filed: October 30, 2017
                                               Date of Removal: March 8, 2018
22
                   Defendants.                 **Hon. Yvonne Gonzalez Rogers**
23

24

25

26

27

28

---

**PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**
*Dones v. Primeflight Aviation Services, Inc., Case No.* **4:18-cv-01503-YGR**

## NOTICE OF MOTION

TO EACH PARTY AND TO COUNSEL FOR EACH PARTY OF RECORD: NOTICE IS HEREBY GIVEN that on September 10, 2019, at 2:00 PM or as soon thereafter as counsel may be heard, Plaintiffs Edgardo Dones and Emmanuel Berjamin ("Plaintiffs") will move for an order granting final approval of the class action settlement between Plaintiffs and Defendant Primeflight Aviation Services, Inc., an Ohio corporation.

This motion will be made and based upon: (1) this notice of motion; (2) the memorandum of points and authorities in support thereof; (3) the declaration of Arlo Garcia Uriarte and the exhibits attached thereto, all of which are filed and served concurrently herewith; as well as (4) the records, pleadings, and papers on file in this action, and upon such other matters as may be presented at the time of hearing on this motion.

Dated: July 31, 2019

_____
Arlo Garcia Uriarte
Liberation Law Group, P.C.
Attorneys for Plaintiffs

# ***Table of Contents***

I.   INTRODUCTION........................................................................................1

II.  PROCEDURAL POSTURE .......................................................................2

III. OVERVIEW OF THE SETTLEMENT AGREEMENT ...........................3

IV.  FINAL SETTLEMENT APPROVAL SHOULD BE GRANTED ...................4

    A.   **Class Action Settlements Are Generally Favored**......................................4

    B.   **Class Action Settlements Should Be Fair, Reasonable, and Adequate** ..................4

    C.   **All Relevant Factors Weigh in Favor of Final Approval** .........................5

        1.   The Parties Reached the Proposed Settlement After Arm's Length Negotiations ..6

        2.   Substantial Investigation Supports Plaintiffs' Recommendation of the Settlement 7

        3.   Class Counsel is Experienced and also Endorses the Settlement ...........................7

        4.   Class Member Reaction Has Been Very Positive.....................................8

        5.   Plaintiffs' Case Has Strengths but Further Litigation is Risky, Expensive, and Complex, Particularly Attaining and Maintaining Class Action Status Through Trial...........................................................................................9

        6.   The Settlement Amount is Fair and Reasonable....................................12

    D.   **The Court Approved Notice Plan Has Been Executed Satisfactorily and Due Process Has Been Satisfied**...........................................................14

    E.   **The Court Should Confirm Its Certification of the Settlement Class**..................14

    F.   **The Parties Propose an Appropriate *Cy Pres* Designee**.........................15

V.   CONCLUSION .........................................................................................16

# *Table of Authorities*

**Cases**

*Benton v. Telecom Network Specialists, Inc.* 220 Cal.App.4th 701 (2013) ................................ 10

*Bussie v. Allmerica Fin. Corp.*, 50 F.Supp2d 59 (D. Mass. 1999) ................................ 5

*Cho v. Seagate Technology Holdings, Inc.*, 177 Cal.App.4th 734 (2009) ................................ 5

*Churchill Village, LLC v. General Electric*  361 F.3d 566 (9th Cir. 2004) ............................ 6, 14

*Clark v. Am. Residential Servs. LLC*, 175 Cal. App. 4th 785 (2009) ............................ 6

*Custom LED, LLC v. eBay, Inc.*, 2014 U.S. Dist. LEXIS 87180 (N.D. Cal. June 24, 2014) .... 2, 8

*Dennis v. Kellogg Co.*, 697 F.3d 858 (9th Cir. 2012) ................................ 15

*Dunk v. Ford Motor Company*, 48 Cal.App.4th 1794 (1996) ................................ 5

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ................................ 15

*In re Beef Industry Antitrust Litigation*, 607 F.2d 167 (5th Cir. 1979) ................................ 15

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) ................................ 6

*In Re Harnischfeger Indus., Inc.* 212 F.R.D. 400 (E.D.Wis. 2002) ................................ 5

*In re Microsoft I-V Cases*, 135 Cal.App.4th 706 (2006) ................................ 5

*In re Pacific Enters. Sec. Litig.*, 47 F.3d 373 (9th Cir. 1995) ................................ 7

*In re Xoma Corp. Sec. Litig.*, U.S. Dist. LEXIS 10502 (N.D. Cal. July 10, 1992) ................................ 6

*Jones v. Agilysys, Inc.*, 2014 U.S. Dist. LEXIS 68562 (N.D. Cal. May 19, 2014) ................................ 2, 8

*Linney v. Cellular Alaska Partnership*, 151 F.3d 1234 (9th Cir. 1998) ................................ 12

*Lusby v. Gamestop, Inc.*, 2015 U.S. Dist. LEXIS 42637 (N.D. Cal. Mar. 31, 2015) ................................ 4

*Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co.*, 834 F.2d 677 (7th Cir. 1987) 15

*Mendez v. R+L Carriers, Inc.* (N.D. Cal. Nov. 19, 2012) 2012 U.S. Dist. LEXIS 165221 ........ 11

*Officers for Justice v. Service Comm'n of City and County of San Francisco*, 688 F.2d 615 (9th Cir. 1982) ................................ 4, 12

*Pilkington v. Cardinal Health, Inc., (In re Syncor ERISA Litig.)*, 516 F.3d 1095 (9th Cir. 2008) 4

*Rosales v. El Rancho Farms,* 2015 U.S. Dist. LEXIS 95756 (E.D. Cal. July 21, 2015) ........... 2, 8

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) ................................ 4

*Trotsky v. Los Angeles Fed. Sav. & Loan Assoc.*, 48 Cal.App.3d 134 (1975) ............................ 14

*Turner v. Murphy Oil USA, Inc.*, 472 F.Supp.2d 830 (E.D.La. 2007) ............................................5

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir. 2005) ........................................5

*Washington v. Joe's Crab Shack*, 271 F.R.D. 629 (N.D. Cal. 2010)...........................................11

*Weinberber v. Kendrick*, 698 F.2d 61 (2d Cir. 1982) ................................................................6

*Wershba v. Apple Computer, Inc.*, 91 Cal.App.4th 224 (2001) .................................................14

**Statutes**

Cal. Labor Code § 2699. .............................................................................................................9

**Treatises**

Manual for Complex Litig. (4th ed. 2004)...................................................................................4

## I.      INTRODUCTION

Plaintiffs Edgardo Dones and Emmanuel Berjamin (hereinafter "Plaintiffs") respectfully request final approval of this $444,000 class action settlement, which was preliminarily approved by the Court on April 12, 2019. The settlement is fully set forth in the Stipulation of Class Action Settlement and Release of Claims[1] (hereinafter "Agreement" and abbreviated "AGMT"). The Agreement is entered into by and among Plaintiffs, individually and on behalf of the Settlement Class,[2] and Defendant PrimeFlight Aviation, Inc., an Ohio corporation ("Defendant") (collectively referred to as "the Parties").

As previously discussed in Plaintiffs' preliminary approval motion, Plaintiff Romeo Vite has agreed to a separate, individual settlement of his claims because during the course of this litigation, all plaintiffs and their attorneys discovered that Plaintiff Vite and a large portion of the putative class[3] signed arbitration agreements[4] with class action waivers. Resultantly, Plaintiffs recommend this proposed settlement only on behalf of putative class members who did not execute such agreements. Those that did will **not** be impacted by this settlement; they will retain their potential claims and the right to pursue them individually.

---

[1] The Agreement is attached as <u>Exhibit "A"</u> to the Declaration of Arlo Garcia Uriarte ("Uriarte Dec.") filed concurrently herewith.

[2] The "Settlement Class" or "Class," as preliminary approved by the Court, refers to all current and former hourly or non-exempt employees of Defendant Primeflight Aviation Services, Inc. who worked in the State of California at any time from four years preceding the date of filing of this action through the entry of final judgment in this action and who did not enter into an arbitration agreement with Defendant.

[3] The Complaint identified a putative class that included all of Defendant's hourly workers in California.

[4] Pursuant to the US Supreme Court's decision in *Epic Systems Corp. v. Lewis*, all plaintiffs and their counsel determined that the certification of a class containing arbitration agreement signees would more than likely not be feasible. *Epic Systems Corp. v. Lewis* 138 S.Ct. 1612, 1616 (2018) ("Congress has instructed in the Arbitration Act that arbitration agreements providing for individualized proceedings must be enforced, and neither the Arbitration Act's saving clause nor the NLRA suggests otherwise.").

Pursuant to the Court's preliminary approval order, the Class was sent notice of the proposed settlement. The notice process was well managed by the Settlement Administrator[5] and is now complete. Class Member response has been overwhelmingly positive because out of 341 individuals, <u>zero</u> have objected. Cofinco Dec. ¶ 12. Courts typically find settlement terms to be presumptively fair when there are no objections or very few objections.[6]

Furthermore, <u>zero</u> Class Members have opted out, so actual and significant monetary compensation awaits everyone. Cofinco Dec. ¶ 14. On average, each person is set to receive $835.92. Cofinco Dec. ¶ 15. The highest estimated settlement payment is $1201.31. *Id.* Individual payments will vary *pro rata* based on employee length of service. A "checks-mailed" process is to be used meaning there is no requirement for Class Members to send in claim forms in order to receive money. AGMT ¶¶ M(2)(a)-(b).

With the above in mind, Class Counsel[7] respectfully submits that the Class is best served by the proposed settlement rather than by further litigation and the ensuing substantial risks. Additionally, as evidenced by Class Member reaction, the proposed settlement is fair, reasonable, and adequate. The Court should have no hesitation granting final approval.

## II.   PROCEDURAL POSTURE

Plaintiffs filed this action on October 30, 2017, asserting claims for: (1) unpaid wages; (2) failure to pay overtime compensation; (3) failure to provide meal period compensation; (4) failure to provide rest period compensation (5) waiting time penalties; (6) failure to furnish accurate wage statements; and (7) unfair competition (Cal. Bus. Prof. Code §§ 17200 et seq.)

---

[5] Emilio Cofinco, a case manager for the Settlement Administrator, CPT Group Inc., has submitted a declaration that summarizes the notice process ("Cofinco Dec."); it is attached as <u>Exhibit "B"</u> to Uriarte Dec.

[6] *E.g. Custom LED, LLC v. eBay, Inc.*, 2014 U.S. Dist. LEXIS 87180, *16 (N.D. Cal. June 24, 2014); *Jones v. Agilysys, Inc.*, 2014 U.S. Dist. LEXIS 68562, *6-7 (N.D. Cal. May 19, 2014); *Rosales v. El Rancho Farms,* 2015 U.S. Dist. LEXIS 95756, *43 (E.D. Cal. July 21, 2015) (absence of objections raises a strong presumption that the terms of a proposed settlement are favorable to the class members); *Stoetzner v. U.S. Steel Corp.*, 897 F. 2d 115, 118-119 (3d. Cir. 1990); *Laskey v. Int'l Union*, 638 F.2d 954 (6th Cir. 1981).

[7] "Class Counsel" refers to Arlo Garcia Uriarte of Liberation Law Group, P.C., as appointed by the Court in its order granting preliminary approval.

1  Defendant removed the action to federal court on March 8, 2018, pursuant to the Class Action

2  Fairness Act of 2005, 28 U.S.C. § 1332(d).

3        The Parties agreed to private mediation with Mark Peters of Duckworth & Peters, LLP

4  in June of 2018. Uriarte Dec. ¶ 3. After the initial disclosures exchange, the Parties also agreed

5  to delay formal discovery with the intention of conserving resources and focusing on the

6  planned mediation. *Id.* However, to properly prepare for settlement negotiations, Plaintiffs

7  insisted on certain informal discovery items from Defendant including data points, a

8  representative payroll and timekeeping sample, and all relevant company policy documents. *Id.*

9  Mediation occurred on September 7, 2018. Uriarte Dec. ¶ 4. The Parties came to terms on the

10 major elements of the proposed settlement and later carefully crafted and executed the

11 Agreement. *Id.* The Court granted preliminary approval of the Settlement on April 12, 2019.

12             **III.    OVERVIEW OF THE SETTLEMENT AGREEMENT**

13       The Agreement entails a $444,000 non-reversionary, maximum settlement fund from

14 which the following agreed upon deductions will be requested: (1) attorney's fees for Class

15 Counsel equaling $133,200, or 30% of the total Settlement amount; (2) $4,735.01[8] in accrued

16 litigation costs for Class Counsel; (3) settlement administration fees for CPT Group, Inc. in the

17 amount of $9,000; (4) Employer-side Payroll Taxes; and (5) Class Representative Service

18 Awards to Plaintiffs equaling $6,000 each, $12,000.00 total. All of these amounts are permitted

19 under the Agreement. AGMT ¶ M.[9]

20       All remaining funds are to be distributed *pro rata* to Settlement Class Members. AGMT

21 ¶¶ M(2)(a)-(b). Claims are not required so, now that the notice process is complete, checks are

22 set to be mailed to all Settlement Class Members. Any unnegotiated checks will be cancelled

23 after 180 days, and the total unnegotiated amount will be awarded to the proposed *cy pres*

24 designee. The Parties propose Instituto Laboral de La Raza, a nonprofit advocacy and workers'

25 resource center in San Francisco, CA, as an appropriate and worthy cy pres. "For over 30 years,

26

27 [8]  Uriarte Dec. ¶ 5.

28 [9]  All references to the AGMT are to section III (Terms of Agreement) unless otherwise
specified.

the Instituto Laboral de la Raza has served low income families of California as a nonprofit advocacy and workers' resource center. Headquartered in the Mission District of San Francisco, the Instituto provides legal services, peer counseling, financial education and access to a network of services to the unorganized working poor." *See*, https://www.ilaboral.org/aboutus.html.

### IV.    FINAL SETTLEMENT APPROVAL SHOULD BE GRANTED

#### A.  Class Action Settlements Are Generally Favored

The Ninth Circuit has communicated a strong judicial policy favoring settlements, especially for complex litigation like the instant class action. *See, e.g. Pilkington v. Cardinal Health, Inc., (In re Syncor ERISA Litig.)*, 516 F.3d 1095, 1101 (9th Cir. 2008) *quoting Officers for Justice v. Service Comm'n of City and County of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982) ("it must not be overlooked that voluntary conciliation and settlement are the preferred means of dispute resolution. This is especially true in complex class action litigation…").

#### B.  Class Action Settlements Should Be Fair, Reasonable, and Adequate

Federal Rule of Civil Procedure ("FRCP") 23(e)(2) mandates court approval of class action settlements to ensure that they are fair, reasonable, and adequate. The decision to approve or reject a settlement is within the sound discretion of the trial judge. *Staton v. Boeing Co.*, 327 F.3d 938, 986 (9th Cir. 2003).

Judicial review of a class action settlement is comprised of a two-step process: (1) a court conducts a preliminary fairness evaluation to determine whether the putative class meets certification requirements for settlement purposes and to determine whether the proposed settlement is within the range of possible approval, which has been granted in this case; and (2) after class members have had an opportunity to object or opt-out, the court must make a final fairness determination. *Lusby v. Gamestop, Inc.*, 297 F.R.D. 400, 412 (N.D. Cal. 2013) relying on the Manual for Complex Litig. § 21.632 (4th ed. 2004).

While trial courts have "broad discretion" to determine whether class action settlements are fair, the inquiry "must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the

negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Cho v. Seagate Technology Holdings, Inc.*, 177 Cal. App. 4th 734, 742-743 (2009) quoting *Officers for Justice*, 688 F.2d at 624. *See also, Dunk v. Ford Motor Company*, 48 Cal. App. 4th 1794, 1801 (1996) (whether a proposed settlement is "fair, adequate, and reasonable" is the paramount concern).

Due regard should be given to what is otherwise a private consensual agreement.[10] *In re Microsoft I-V Cases*, 135 Cal.App.4th 706, 723 (2006). Because all together, "the [trial] court's determination is nothing more than 'an amalgam of delicate balancing, gross approximations and rough justice.'" *Dunk, supra* at 1801, *quoting Officers for Justice*, 688 F.2d at 624. *See also, Wershba v. Apple Computer,* 91 Cal. App. 4th 224, 246 (2001) ("The proposed settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved had plaintiffs prevailed at trial.")

### C.  All Relevant Factors Weigh in Favor of Final Approval

Now that the proposed settlement has been preliminarily approved and the notice process has been successfully completed, the Court should grant final approval because the settlement is indeed fair, reasonable, and adequate as required by applicable law. *Cho*, *supra* at 742-743. A presumption of fairness exists where: (1) the settlement is reached through arm's length bargaining; (2) investigation and discovery are sufficient to allow counsel and the court to act intelligently; (3) counsel are experienced in similar litigation; and (4) the percentage of objectors is small. *Dunk*, *supra* at 1802.

For additional guidance, courts typically consider some or all the following factors when deciding final approval: "(1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery

---

[10] The proponents of a class settlement can obtain a strong initial presumption that the compromise is fair and reasonable by establishing that the settlement was reached after arms-like negotiations by competent counsel. *E.g., Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005); *Turner v. Murphy Oil USA, Inc.*, 472 F.Supp.2d 830, 844 (E.D.La. 2007); *In Re Harnischfeger Indus., Inc.* 212 F.R.D. 400, 410 (E.D.Wis. 2002); *Bussie v. Allmerica Fin. Corp.*, 50 F.Supp2d 59, 77 (D. Mass. 1999).

completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement." *Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566, 575 (9th Cir. 2004); *In re Bluetooth Headset Prods. Liab. Litig.,* 654 F.3d 935, 942 (9th Cir. 2011) ("The factors in a court's fairness assessment will naturally vary from case to case.")

### 1. The Parties Reached the Proposed Settlement After Arm's Length Negotiations

The Agreement was reached at arms-length and executed in good faith by the Parties. The Parties came to terms after a full day's mediation with Mark Peters, Esq., a respected mediator with experience mediating class and collective action cases in the San Francisco Bay Area. Uriarte Dec. ¶ 4. Both sides prepared detailed mediation briefs and evaluated Defendant's potential liability on a class-wide basis. *Id.* After the major elements of a proposed settlement were agreed to, counsel for both sides carefully crafted, negotiated, and finalized the Agreement. *Id.*

Moreover, Class Counsel submits that given the constraints and realities of the case, the Parties have been able to construct a settlement that is fair, reasonable, adequate, and in the best interests of the class. *See, Clark v. Am. Residential Servs. LLC*, 175 Cal. App. 4th 785, 786 (2009) ("A court should give considerable weight to the competency and integrity of counsel and the involvement of a neutral mediator in assuring itself that a class action settlement agreement represents an arm's-length transaction entered without self-dealing or other potential misconduct."). *See also, In re Xoma Corp. Sec. Litig.,* U.S. Dist. LEXIS 10502, at *9 (N.D. Cal. July 10, 1992), citing *Weinberber v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982) ("The court is entitled to rely heavily on the assessment of able counsel negotiating at arms' length…When a settlement is achieved through arms-length negotiations between experienced counsel, the court should be hesitant to substitute its own judgment for that of counsel absent a showing of fraud, collusion or other forms of bad faith.").

///

///

2.  <u>Substantial Investigation Supports Plaintiffs' Recommendation of the Settlement</u>

Before any settlement negotiations began, Class Counsel insisted on certain, key items from Defendant so that Plaintiffs could effectively negotiate at mediation. Uriarte Dec. ¶ 3. Defendant provided the following data points, which Plaintiffs used to create their damages model: (1) 341 putative class members; (2) 100 of those putative class members are no longer employed by Defendant; (3) 53,915 workweeks in the Claim Period; (4) 23,722 pay periods in the Claim Period; and (5) $14.36 is the average pay rate for putative class members. *Id.*

Plaintiffs also insisted upon and Defendant produced: (1) a representative sample (20%) of timekeeping and payroll records for the putative class; and (2) all wage and hour policies relevant to Plaintiffs' claims. *Id.* Additionally, Class Counsel instructed Plaintiffs to speak with their co-workers and request their contact information; Class Counsel instructed Plaintiffs to ask whether this information could be shared with their attorneys. Uriarte Dec. ¶ 6.

Many putative class members were amenable, so Class Counsel used the information attained by Plaintiffs to contact and interview numerous putative class members. *Id.* Class Counsel seized this opportunity to gather declarations in support of Plaintiffs' case. *Id.* The declaration gathering effort was crucial because it allowed Plaintiffs to continue to develop their case and negotiate more effectively at mediation. *Id.* In turn, Plaintiffs were armed with sufficient information to understand the full breadth of their putative class claims; their decision to settle was properly informed, and their recommendation of the instant settlement is sound.

3.  <u>Class Counsel is Experienced and also Endorses the Settlement</u>

Generally, courts should rely upon the judgment of experienced counsel when assessing the adequacy of proposed class action settlements. *E.g. Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) (courts have long deferred to the judgment of counsel when approving class settlements so long as they are experienced and well-informed); *In re Pacific Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995) ("Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation.").

Class Counsel has substantial class action experience, specifically regarding actions involving the application of California's wage and hour laws. Uriarte Dec. ¶¶ 14-24. Counsel and his law firm have litigated several class actions against airport employers representing airport employees. Uriarte Dec. ¶¶ 19-20. Counsel's experience renders him qualified to evaluate the class claims and defenses at hand. Counsel is confident that the proposed settlement meets all applicable requirements of California law, and given the unique circumstances present, it is in the best interests of the Class. Uriarte Dec. ¶ 28.

4.    <u>Class Member Reaction Has Been Very Positive</u>

The Class' reaction clearly supports final approval. <u>No one</u> has objected, and <u>no one</u> has requested exclusion from the proposed settlement. Cofinco Dec. ¶¶ 12, 14. Numerous courts have found settlement terms to be presumably fair when there is a low percentage of objectors. *E.g. Custom LED, LLC v. eBay, Inc.*, 2014 U.S. Dist. LEXIS 87180, *16 (N.D. Cal. June 24, 2014); *Jones v. Agilysys, Inc.*, 2014 U.S. Dist. LEXIS 68562, *6-7 (N.D. Cal. May 19, 2014); *Rosales v. El Rancho Farms,* 2015 U.S. Dist. LEXIS 95756, *43 (E.D. Cal. July 21, 2015) (absence of objections raises a strong presumption that the terms of a proposed settlement are favorable to the class members); *Stoetzner v. U.S. Steel Corp.*, 897 F. 2d 115, 118-119 (3d. Cir. 1990); *Laskey v. Int'l Union*, 638 F.2d 954 (6th Cir. 1981).

The Court also finds information regarding the delivery of notice packets relevant. *See,* <u>The Northern District's Procedural Guidance for Class Action Settlements</u>, Sec. Final Approval ¶ 1 (November 1, 2018). Only thirteen notice packets were returned to the Settlement Administrator by USPS. Cofinco Dec. ¶¶ 10-11. For these thirteen individuals, one new address was provided by USPS and a notice packet was re-mailed to that new address. *Id.* For the remaining twelve notice packets, the Settlement Administrator "performed a skip-trace to locate a better address using Accurint, one of the most comprehensive address databases available." *Id.* "Accurint utilizes hundreds of different databases supplied by credit reporting agencies, public records and a variety of other national databases." *Id.*

The Settlement Administrator was able to re-mail six notice packets out of the twelve. *Id.* In the end, only eight notice packets remained undeliverable because additional information

1   about the recipients could not be attained. *Id.* This means that 97.65% of the notice packets sent

2   to the class were successfully delivered (333 out of 341). Considering this and the fact that zero

3   objections or opt-out requests were received, Plaintiffs submit that the notice process was

4   extremely successful.

5       5.   <u>Plaintiffs' Case Has Strengths but Further Litigation is Risky, Expensive, and</u>

6            <u>Complex, Particularly Attaining and Maintaining Class Action Status</u>

7            <u>Through Trial</u>

8       Plaintiffs detailed their perception of the strengths and weaknesses of their class

9   allegations when moving for preliminary approval. Nothing has occurred since then to alter

10  their position. Meal period and rest period violations are Plaintiffs' central allegations.

11  Plaintiffs, as confirmed by the numerous putative class members they conferred with, assert the

12  following main reasons for break violations: (1) Defendant's alleged deficient or lacking

13  policies/practices; (2) alleged understaffing, especially a lack of breakers/relievers; (3) and the

14  company's alleged previous tendency to assign heavy workloads that did not allow for break

15  opportunities.

16      In Plaintiffs' view, Defendant's alleged break violations caused two main problems: (1)

17  owed meal and rest period compensation; and (2) unpaid wages in connection with meal period

18  violations. Specifically, regarding the latter, Plaintiffs discovered, through their timekeeping

19  and payroll analysis, that Defendant uses "auto-deduction." In other words, the company

20  sometimes automatically deducted meal period time from an employee's total day's pay.

21  Plaintiffs' analysis revealed between 16.63% and 22.34% of automatic deduction during the

22  Class Period. If meal period violations indeed coincided with this automatic deduction, then

23  Defendant would allegedly be liable for unpaid wages.

24      Lastly, in terms of core violations, Plaintiffs suspected uneven rounding that led to the

25  underpayment of wages. Plaintiffs analyzed their own payroll and timekeeping records and

26  believed unlawful rounding was potentially widespread among the putative class. However,

27  analysis of the representative timekeeping and payroll sample provided by Defendant did not

28  reveal underpayment due to rounding.

In general, Plaintiffs believe their claims are strong from a class certification perspective because in their view, Defendant operated at SFO using central guidelines and protocols that were wholly applicable to Settlement Class members during the Class Period. This includes written meal and rest period policies, on the ground practices regarding the application of these written policies, and policies or practices related to the payment or non-payment of meal period compensation and rest period compensation ("break penalty pay").

Plaintiffs' principal class theories related to their core claims are: (1) Defendant never paid any break penalty pay, which is evidence of a universal failure; (2) Defendant's automatic deduction policy combined with an alleged failure to provide meal periods potentially equals unpaid wages liability. Plaintiffs' theories have certain fundamental strengths and weaknesses. The strengths include:

- Plaintiffs allege that Defendant lacked a break penalty pay policy or practice during the Covered Period. A lack of break penalty pay policy or practice when breaks are sometimes not provided supports class certification in and of itself. *See, Benton v. Telecom Network Specialists, Inc.* 220 Cal.App.4th 701, 724 (2013) (acknowledging that an unlawful lack of policy may provide sufficient support for meal and rest period class certification);

- Plaintiffs believe they have raised numerous common questions, which is key to attaining class certification. Key among them are: (1) whether the breaks provided by Defendant were provided evenly to all groups of employees; (2) whether Defendant ever maintained a rest period compensation policy; (3) whether Defendant's lack of rest period compensation policy is an unlawful, certifiable issue; (4) whether Defendant ever maintained a meal period compensation policy; (5) whether Defendant's lack of a meal period compensation policy is an unlawful, certifiable issue; (6) whether Defendant failed to pay wages when employees allegedly worked during unpaid meal period times; and (7) whether Defendant issued inaccurate wage statements due to the aforementioned break penalty pay and unpaid wages issues.

Despite these strengths, Plaintiffs recognize several weaknesses. These listed below are important points that underscore, among other things, common difficulties regarding the certification of meal and rest period classes:

- Defendant could argue that Class Members may have experienced *isolated* meal and rest break issues due to deviations from their lawful written policies, but there is no "predominance" for class certification purposes. Meal and rest period claims are more difficult to certify when plaintiffs rely on allegedly

unlawful practices or unwritten policy. *See, e.g. Washington v. Joe's Crab Shack* 271 F.R.D. 629, 640 (N.D. Cal. 2010) (finding individual issues predominated when plaintiff contended that defendant followed a common unwritten policy of denying meal and rest breaks); *Mendez v. R+L Carriers, Inc.* 2012 U.S. Dist. LEXIS 165221, at *44 (N.D. Cal. Nov. 19, 2012) ("when a plaintiff's claims are based on allegations of an unwritten practice, as opposed to a written policy, the putative class members will often have to prove individual elements in order to show the defendant's liability) (internal quotations omitted).

- Meal and rest period classes are generally difficult to certify because of *Brinker's* "provide" standard ("an employer must relieve the employee of all duty for the designated period but need not ensure that the employee does no work.") *Brinker Restaurant Corp. v. Superior Court,* 53 Cal. 4th 1004, 1034-1035 (2012). Relying on this, Defendant could argue that its employees are regularly provided breaks, but individual issues sometimes occur that disturb a common policy or practice. This potential difficulty is of particular concern when dealing with large putative classes, as here, that contain hundreds of members with experiences that naturally vary to some degree. Furthermore, if Plaintiffs are unable to establish meal period violations, then their unpaid wages theory is not viable.

- Through payroll and timekeeping analysis, Plaintiffs discovered that their rounding claims were likely not significant enough to be viable classwide. Unpaid wages, especially if overtime is implicated, provide Plaintiffs with the greatest universe of potential damages.

Undoubtedly, if it were not for this proposed settlement, any further litigation would yield an uncertain result. Class actions are generally complex cases, and this lawsuit presents its own set of potential difficulties. Plaintiffs' counsel believes the risks associated with further litigation are substantial. Uriarte Dec. ¶ 7.

For example, the following are just some of the risks considered: (1) continued discovery on class certification issues could reveal defects in Plaintiffs' class theories; (2) the Court could refuse certification as to some or all of Plaintiffs' claims; (3) in the Court's eventual estimation, Plaintiffs may not formulate a convincing trial plan that effectively deals with any individual issues; (4) if Plaintiffs attain certification in whole or in part, Defendant may attain decertification after post-certification discovery; (5) Plaintiffs may lose at trial, and even if they can win, Defendant may successfully appeal any judgment attained; and (6) further progression of this case would only lead to increased expenses and hours worked by Plaintiffs' counsel that

1  would reduce future putative class member recoveries and not necessarily lead to increased

2  gains. *Id.*

3              6.  <u>The Settlement Amount is Fair and Reasonable</u>

4        Courts typically analyze the reasonableness of the settlement amount in view of the

5  following: "it is the very uncertainty of outcome in litigation and avoidance of wasteful and

6  expensive litigation that induce consensual settlements. [A] proposed settlement is thus not to

7  be judged against a hypothetical or speculative measure of what *might* have been

8  achieved…rather the very essence of a settlement is…a yielding of absolutes and an abandoning

9  of highest hopes. The fact that a proposed settlement may only amount to a fraction of the

10  potential recovery does not, in and of itself, mean that the proposed settlement is grossly

11  inadequate and should be disapproved." *Officers for Justice*, 688 F.2d at 625; *Linney v. Cellular*

12  *Alaska Partnership* 151 F.3d 1234, 1242 (9th Cir. 1998).

13        The Net Settlement Fund is a significant amount and represents an acceptable proportion

14  of Plaintiffs' best-case scenario recovery, which is of course far from guaranteed. Class Counsel

15  performed a damages analysis prior to mediation to be well-informed during settlement

16  negotiations. Uriarte Dec. ¶ 8. This was only done after lengthy meetings with Plaintiffs and

17  numerous interviews with putative class members. Plaintiffs' counsel interviewed more than 50

18  putative class members and received invaluable information from almost all of them. Uriarte

19  Dec. ¶ 6.

20        Meal and rest period failure rates were assigned to each workweek in the Class Period as

21  part of Plaintiffs' damages analysis. Uriarte Dec. ¶ 9. Plaintiffs assigned a meal period failure

22  rate of one per workweek during the Class Period. *Id.* This is based on their own experiences,

23  interviews with putative class members, and the timekeeping/payroll analysis performed in

24  anticipation of mediation. *Id.* One hour's pay ($14.36) multiplied by 53,915 total workweeks

25  equals $774,219.40. This amount is reduced proportionally because, per the timekeeping/payroll

26  sample analyzed, only 62.27% of shifts are over 5 hours. *Id.* This means that 38.73% of shifts

27  do not require a meal period. $482,106.42 is the revised total. *Id.*

28

Plaintiffs assigned a rest period failure rate of two per week. Uriarte Dec. ¶ 10. This is based on Plaintiffs' and putative class member experience (all complained most vehemently about rest period issues). *Id.* Two hours' pay ($28.72) multiplied by 53,915 total workweeks equals $1,548,438.80. This total amount is also reduced proportionally because a percentage of shifts worked by putative class members were less than four hours (about 25%). *Id.* $1,161,329.10 is the revised total.

Plaintiffs also claimed unpaid wages due to Defendant's policy or practice of automatically deducting meal time from the total days' pay of putative class members. Uriarte Dec. ¶ 11. Plaintiffs, when analyzing the timekeeping and payroll sample provided by Defendant, observed a range of time when auto-deduction coincided with meal period violations: 16.63% - 22.34%. *Id.* Using the midpoint of this range, 19.49%, Plaintiffs arrived at 10,508 estimated instances of unpaid time due to auto-deduction and meal period violations. *Id.* 10,508 multiplied by a half-hour of wages ($7.18) equals $75,447.44.

Plaintiffs realize this number could be either conservative or aggressive. It could be conservative because some of the meal period violations alleged were not simply a total miss of the thirty-minute break; sometimes, a potential violation occurred because a meal period was provided too late, and other times it occurred because of a truncated meal period. However, the calculus does not include potential overtime compensation, if the unpaid wage violation occurred during a longer shift. Therefore, Plaintiffs believe the estimate is reasonable in light of both considerations.

Adding up the foregoing, Plaintiffs assign a total best-case scenario value of $1,718,882.96 to their core claims of unpaid meal premiums, unpaid rest premiums and unpaid wages. The $444,000.00 proposed Maximum Settlement Amount represents a 25.83% recovery when compared to Plaintiffs' best-case scenario recovery. This is a very positive result, especially at this point of the litigation (pre-certification). Notably, there is a serious risk that Plaintiffs might fail as they attempt to get the class certified, defend de-certification attempts by Defendant if the class does get certified, propose a reasonable trial plan, succeed at trial, and

1  defend any potential appeals. Plaintiffs submit that a 25% chance of total success is reasonable,

2  even optimistic at this stage of litigation.

3       Additionally, Plaintiffs recognize that their best-case scenario recovery would also

4  include additional moneys for potential liquidated damages, wage statement violations, waiting

5  time penalties, interest, and attorney's fees. However, courts have not required a focus on

6  escalated damages that accompany core violations (for example "treble damages" in antitrust

7  cases) when evaluating the value of specific claims for settlement approval purposes. Instead,

8  the way the settlement compensates for "actual injuries" is the greater concern. *Rodriguez* F.3d

9  948 at 965.

10  **D. The Court Approved Notice Plan Has Been Executed Satisfactorily and Due**

11      **Process Has Been Satisfied**

12       Class notice procedures "must fairly apprise the class members of the terms of

13  compromise and the options open to dissenting class members." *Trotsky v. Los Angeles Fed.*

14  *Sav. & Loan Assoc.*, 48 Cal. App. 3d 134, 151-52 (1975). Class notice should strike a balance

15  between thoroughness and the need to avoid unduly complicating its content. *Wershba*, *supra*

16  91 Cal. App. 4th at 252. Generally, "notice is satisfactory if it…describes the terms of the

17  settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come

18  forward and be heard." *Churchill Village, LLC v. General Electric* 361 F.3d 566, 575 (9th Cir.

19  2004) (internal quotations omitted).

20       Here, the Court-approved notice procedure has met all of the aforementioned

21  requirements. As previously determined by the Court, the relevant Notice form contained all

22  required information. Moreover, the Class had sufficient time to decide whether to opt-out or

23  object to the settlement. Therefore, the Court-ordered notice procedures have been properly

24  executed and due process has been satisfied.

25      **E. The Court Should Confirm Its Certification of the Settlement Class**

26       Parties to a class action suit may negotiate a proposed settlement prior to obtaining class

27  certification. *Wershba v. Apple Computer, Inc.*, 91 Cal.App.4th 224, 240 (2001)

28  ("precertification settlements are…routinely approved if found to be fair and reasonable") *citing*

1      *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998); *Mars Steel Corp. v. Continental*

2      *Illinois Nat'l Bank & Trust Co.*, 834 F.2d 677 (7th Cir. 1987); *In re Beef Industry Antitrust*

3      *Litigation*, 607 F.2d 167 (5th Cir. 1979).

4      For the instant action, the Court ordered the Settlement Class provisionally certified in

5      its preliminary approval order on April 12, 2019. No subsequent event has occurred to cast

6      doubt on the Court's initial determination. In fact, the notice process was completed

7      satisfactorily, and class member reaction has been very positive. As such, Plaintiffs request that

8      the Court confirm its grant of class certification for settlement purposes only.

9      **F. The Parties Propose an Appropriate *Cy Pres* Designee**

10      The Parties submit that Instituto Laboral de La Raza (hereinafter "ILR"), a nonprofit

11      advocacy and workers' resource center in San Francisco, CA, is an appropriate and worthy *cy*

12      *pres*. Courts "frequently apply [the *cy pres* doctrine] in the settlement of class actions…

13      (citations omitted). Used in lieu of direct distribution of damages to silent class members, this

14      alternative allows for aggregate calculation of damages, the use of summary claim procedures,

15      and distribution of unclaimed funds to indirectly benefit the entire class (citations omitted). To

16      ensure that the settlement retains some connection to the plaintiff class and the underlying

17      claims, however, a *cy pres* award must qualify as 'the next best distribution' to giving the funds

18      directly to class members (citations omitted)." *Dennis v. Kellogg Co.*, 697 F.3d 858, 865 (9th

19      Cir. 2012). More specifically, the Ninth Circuit requires "that there be a driving nexus between

20      the plaintiff class and the *cy pres* beneficiar[y] (citations omitted). A *cy pres* award must be

21      guided by (1) the objectives of the underlying statute(s) and (2) the interests of the silent class

22      members and must not benefit a group too remote from the plaintiff class (citations omitted)."

23      *Id.*

24      Plaintiffs submit that ILR fulfills these requirements. As a primary matter, it should be

25      highlighted that the proposed *cy pres* will only receive settlement funds if settlement checks are

26      not negotiated by the Class. AGMT ¶ 8(e)(2). Moving to the rigors identified in *Dennis*, there is

27      a driving nexus between the Class at hand and ILR because the Class is a group of low-wage,

28      hourly workers who were allegedly deprived of their wage and hour rights by Defendant. ILR

helps workers just like these fight for justice, specifically the kind of recompense that the Class is set to receive here.

"For over 30 years, the Instituto Laboral de la Raza has served low income families of California as a nonprofit advocacy and workers' resource center. Headquartered in the Mission District of San Francisco, the Instituto provides legal services, peer counseling, financial education and access to a network of services to the unorganized working poor." *See*, https://www.ilaboral.org/aboutus.html. Clearly, the objectives of ILR are closely related to the objectives of the Labor statutes Defendant allegedly violated. Any silent Class members will share a close relationship between the types of workers ILR seeks to benefit. So, there is no risk here of benefitting a group "too remote from the plaintiff class." *Id.*

## V.     CONCLUSION

For all reasons stated herein, Plaintiffs respectfully request that the Court grant final approval of the proposed settlement.


Respectfully Submitted,


Dated: July 31, 2019,

_____
Arlo Garcia Uriarte
Liberation Law Group, P.C.
Attorneys for Plaintiffs